OPINION
Defendant, Tafesse Denu, appeals a jury verdict awarding plaintiff, Baye Abetew, $215,447.61 in compensatory damages, and $250,000 in punitive damages, arising as a result of the fraudulent sale of one-half of defendant's business to plaintiff.
On December 31, 1998, plaintiff filed a verified complaint asserting several causes of action against defendant. Trial began on September 11, 2000, and lasted approximately three weeks. At the conclusion of the presentation of evidence, the jury deliberated for a little over three hours before returning its verdict.
After trial, defendant filed a motion for mistrial, motion for new trial, motion for judgment non obstante veridicto, as well as a motion for remittitur. Plaintiff responded with a motion for attorney fees and prejudgment interest. On December 22, 2000, the trial court issued a decision which denied each of defendant's motions, and granted plaintiff attorney fees and expenses in the amount of $49,283.48. Defendant now appeals, raising the following fifteen assignments of error:
 1. The trial court erred in failing to grant appellee's motion for directed verdict or grant a judgment notwithstanding the verdict on appellee's claim for fraud. Appellee's claim sounded in contract rather than fraud. The jury's verdict for fraud was supported by insufficient evidence and was against the manifest weight of the evidence.
 2. The trial court erred in allowed [sic] in admitting other acts evidence concerning whether appellant borrowed money from two people that he did not repay according to the terms of their loan agreements, in allowing the jury to make a determination without any expert handwriting testimony whether appellant's signature was on a note of an other acts matter by comparing specimens of appellant's handwriting, in allowing counsel for appellee to provide unsworn testimony during cross examination concerning an out of court experiment he conducted where the attorney covered portions of documents and asked appellant if he would identify whether the signature on the bottom of an otherwise blank page was real or forged, and in failing to strike other acts testimony that appellant did much criminal stuff.
 3. The trial court abused its discretion in admitting pleadings involving other acts evidence against Appellant and refusing to admit portions of the pleadings that contain admissions by Appellee.
 4. The trial court abused its discretion in refusing to instruct the jury as to the appellant's affirmative defenses of settlement, accord and satisfaction, estoppel, failure of consideration, payment, and conditions precedent.
 5. The trial court erred in allowing into evidence and allowing the jury to deliberate using a transcript of a tape made by Appellee which Appellant challenged as being inaccurate when the tape itself was also admitted into evidence in violation of Evid.R. 1002.
 6. The trial court erred in allowing appellee's translator to testify about his summary translation of a conversation appellee claimed to have had with appellant which appellee claimed to have secretly taped when the conversation was primarily in a foreign language, a substantial portion of the tape was inaudible, and the translator summarized portions of the tape into English rather than providing a trustworthy verbatim translation of the audible portions of the tape.
 7. The trial court abused its discretion in allowing a witness to testify about habit evidence that certain Ethiopians who believe in the Old Testament give money without a receipt.
 8. The trial court erred in allowing Appellee to introduce into evidence excerpts of a deposition not filed with the court one day before trial.
 9. The trial court awarded in [sic] appellee improper expenses and/or costs including overhead expenses such as copying and paralegal costs, improper transcript and court reporter costs.
 10. The trial court committed plain error in instructing the jury that the jury could order rescission as a result of fraud under a preponderance of evidence standard when rescission as a result of fraud requires a finding by clear and convincing evidence.
 11. The trial court erred in instructing the jury to allow appellant to rescind the contract plus seek damages for lost profits on the rescinded contract.
 12. The trial court erred in failing to grant Appellee's motion for directed verdict or grant a judgment notwithstanding the verdict on Appellee's claim for punitive damages. The jury's verdict for punitive damages was supported by insufficient evidence and was against the manifest weight of the evidence.
 13. The trial court abused its discretion when the court refused to appoint an interpreter when a witness who had trouble speaking English said he could not understand questions asked of him, referred to the witness in a derogatory manner calling him "Mr. whatever you [sic] name is" and allowing counsel for Appellee to repeatedly testify about his dealings with the witness over objection.
 14. The trial court abused its discretion in awarding appellee attorneys fees.
 15. The trial court erred abused [sic] its discretion in refusing to grant a new trial where appellant was denied a fair trial as the result of cumulative evidentiary errors which prejudiced the jury and an excessive jury award that was inspired by passion and prejudice on a verdict that was not supported by the evidence.
Plaintiff also appeals, challenging the trial court's decision to deny his request for an award of prejudgment interest, and raises a single cross-assignment of error as follows:
 The trial court erred to the prejudice of cross-appellant by failing to award prejudgment interest pursuant to either R.C. § 1343.03(A) or (C).
The testimony of plaintiff and defendant was altogether inconsistent, and often confusing and convoluted. Each accused the other of lying. Plaintiff essentially claimed that defendant agreed to sell, and he agreed to purchase, a one-half ownership interest in defendant's business. On the other hand, defendant claimed that plaintiff's testimony, as well as the evidence in support of his claim, was false.
Plaintiff immigrated to the United States from Ethiopia in 1989. In February 1998, plaintiff was an employed cab driver working in Boston, Massachusetts. In late February of that year, plaintiff and a co-worker, Germai Zeleke, visited Columbus where they met defendant, who had also immigrated from Ethiopia in 1990, and who owned and operated several central Ohio retail convenience stores. Among these was the "Brothers Drive Thru" located on Livingston Avenue, the "Daily Mart" located on Lockborne Road, and the "Quick Stop" located at 1380 South Fourth Street, in Columbus Ohio.
Plaintiff and Zeleke were introduced to defendant by the business partner of one of Zeleke's family members. According to the testimony of plaintiff, shortly after meeting defendant, defendant began to inquire if the two would be interested in purchasing one of his stores. After some discussion, plaintiff and Zeleke verbally agreed to purchase the Brothers Drive Thru. Plaintiff and Zeleke paid defendant $100,000 as an earnest money down payment on March 4, 1998. Defendant gave them a signed receipt for this deposit.
After making the down payment, plaintiff and Zeleke returned to Boston to raise the remainder of the purchase price. By March 14, 1998, the two returned to Columbus where they signed a formal purchase agreement with defendant. At that time, plaintiff and Zeleke paid defendant an additional $40,000.
Plaintiff and Zeleke started operating the drive thru shortly after giving defendant their initial earnest money deposit. Almost immediately, however, the working relationship between the two deteriorated. After closing the purchase from defendant, Zeleke commenced a campaign to reorganize ownership of the business to include Zeleke's brother as an equal one-third owner. Plaintiff and Zeleke eventually reached an impasse, plaintiff steadfast in his belief the two should remain one-half owners, and Zeleke equally steadfast that he, plaintiff, and his brother should become equal one-third owners.
Unable to reach an agreement on their own, plaintiff and Zeleke contacted attorney William Abraham, who had assisted them in the purchase of Brother's Drive Thru. Abraham suggested that the two formally meet to see if there was any chance of amicably resolving their dispute. To that end, Abraham offered his office as a convenient meeting place, but advised each to retain independent counsel since their interests were now likely antagonistic. It is at this point that defendant reentered the situation. Defendant was also invited to the parties' April 8, 1998 meeting because he had stated that he was willing to repurchase the Brothers Drive Thru if plaintiff and Zeleke were unable to reach an agreement.
The testimony of plaintiff and defendant dramatically differs concerning the events which occurred on, and after April 7, 1998. According to plaintiff, defendant visited plaintiff on April 7 and asked if he wished to become an equal shareholder in defendant's corporation. Later that day, plaintiff claims that defendant returned with his business advisor, Seifu Begashaw, and the two drove plaintiff to view defendant's other stores, the Daily Mart and Quick Stop. The three then ate dinner at a local restaurant.
While they dined, Behgashaw and defendant characterized defendant as a successful businessman who traveled frequently. Stating that he believed plaintiff to be a hard-working, trustworthy individual, defendant offered to bring plaintiff into his enterprise as an equal shareholder for a purchase price of $200,000. Plaintiff explained that defendant agreed to credit towards plaintiff's purchase of half of defendant's business, the money that would be returned to plaintiff as a result of the repurchase of the Brothers Drive Thru.
Plaintiff testified that the next morning defendant and Begashaw drove him to the meeting with Zeleke. That meeting was attended by a number of other parties, including Zeleke's attorney, Zeleke's brother-in-law, and defendant and his attorney. After meeting for several hours, plaintiff and Zeleke were unable to overcome their impasse. The parties decided that the March 14, 1998 purchase agreement between plaintiff, Zeleke, and defendant would be cancelled. Defendant then returned his share of the Brothers Drive Thru purchase price to Zeleke in cash, but kept plaintiff's share, which he agreed would be credited towards plaintiff's investment in defendant's business as discussed the night before.
Shortly thereafter, plaintiff returned to Boston to wind up his affairs and to raise additional money. In total, plaintiff raised an additional $117,000, which, when combined with the credit from the repurchase of the Brothers Drive Thru, amounted to more than $185,000. Defendant subsequently agreed that this would be sufficient to purchase a one-half interest in his stores, and a closing was held at the office of Begashaw in Cincinnati on April 18, 1998. At closing, plaintiff received a copy of a "subscription agreement," and corporate minutes, as well as a stock certificate. The original subscription agreement and corporate minutes were kept by defendant. Interestingly, the stock certificate was dated April 7, rather than April 18, 1998.
As noted previously, defendant's testimony was almost directly contrary to that of plaintiff. First, defendant claimed that plaintiff did not give him any money on April 18, 1998, and did not purchase any interest in his business. Defendant also denied that he or Begashaw met with plaintiff on April 7, 1998, and denied that they discussed the purchase of one-half of defendant's business over dinner. Further, defendant denied driving plaintiff to the meeting at attorney Abraham's office the next day. Although defendant admitted that he endorsed and deposited into his account two checks written by plaintiff, one for $51,000, and the other for $17,041, defendant claimed that he did so only because he was cashing the checks as a favor for plaintiff. In his words, he was acting as a bank for plaintiff because plaintiff allegedly could not find a bank willing to do business with him. Defendant held to this claim in spite of the fact that the memo portion of the checks were both annotated with wording that the checks were for the purchase of a one-half interest in "Denu's Family Import Export, Inc."
Defendant also denied that he and plaintiff met in Begashaw's office in Cinicinnati on April 7, 1998 to close plaintiff's purchase of an interest in his business. Rather, defendant claims that plaintiff asked him to prepare "documents" that were to be cancelled the next day when defendant repurchased the Brothers Drive Thru from plaintiff and Zeleke. Specifically, defendant claims that he agreed to prepare two stock certificates, one indicating that plaintiff owned 425 shares in "Denu's Family Import Export, Inc.," and the other indicating that Zeleke owned 425 shares.
According to defendant, plaintiff wanted these "documents" in order to prove that he was an equal shareholder in the corporation plaintiff and Zeleke formed to purchase the drive thru. It is indeed hard to understand how these papers, prepared well after the sale by Begashaw, could be of any benefit to plaintiff, or why defendant would agree to create false stock certificates showing that plaintiff and Zeleke had an ownership interest in his import business. Indeed, defendant claims that plaintiff later fraudulently altered these certificates to support his claim that he purchased a one-half interest in defendant's business.
Defendant's testimony regarding the April 8, 1998 meeting also dramatically differed from that of plaintiff. For example, defendant claims that he arrived at the April 8 meeting with $142,000 in cash, which he returned in full to plaintiff and Zeleke. After that date, defendant claims that he had no further contact, nor any business relationship with plaintiff until November 1, 1998, when plaintiff allegedly asked if he could observe defendant manage the Daily Mart drive thru so that he could learn the business. The parties' testimony also differed in that plaintiff testified that he continued to manage the daily operation of the Brothers Drive Thru after the April 18, 1998 repurchase, while defendant claimed that plaintiff never managed the Brothers Drive Thru.
Defendant also had an unusual explanation for why plaintiff was added as an authorized signatory to defendant's business checking account. Defendant testified that he was leaving the country and that he allowed plaintiff access to his financial accounts so that defendant's wife would not have to be burdened with the responsibility of attending to the affairs of defendant's businesses. Defendant specifically denied that plaintiff was given account access because he had an ownership interest in defendant's business.
Sometime in November 1998, plaintiff asked defendant for a draw of his profit share. Defendant responded evasively then, and on several later occasions, prompting plaintiff's request for a face-to-face meeting. Unbeknownst to defendant, plaintiff tape-recorded their conversation during this meeting, a copy of which was admitted as evidence at trial. While plaintiff and defendant spoke their native tongue, Ashebar Belayneh, a witness called by plaintiff at trial, translated the recording and prepared a summary. According to Belayneh, the recording contained an acknowledgment by defendant that plaintiff had, in fact, invested $185,000 to purchase one-half of defendant's business, and that he owed plaintiff approximately $27,000, the amount of plaintiff's profit-share draw. Plaintiff's personal translation of this recording paralleled that of Belayneh.
At trial, plaintiff introduced a promissory note handwritten by defendant, signed by defendant, and payable to plaintiff in the amount of $27,406.61, a portion of the amount defendant admitted to owing plaintiff during the November tape-recorded conversation. That note is dated November 8, 1998, the same date of the parties' tape-recorded meeting.
Plaintiff testified that, after their November meeting, defendant became very angry and hostile towards him, to the extent that plaintiff filed police reports reporting defendant's threats. Plaintiff testified that he continued working at the Daily Mart because he thought it was the only way to protect his investment. However, on November 27, 1998, defendant changed the locks on the store. According to defendant, he locked plaintiff out because plaintiff had stopped ordering inventory, and had kept all of the receipts for sales made from November 1 to November 27, 1998.
In his first assignment of error, defendant claims that the jury's verdict stands against the manifest weight of the evidence. Judgments or verdicts supported by "some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C.E. Morris Co. v. Foley Construction Co. (1978), 54 Ohio St.2d 279, 280, citing Chicago Ornamental Iron Co. v. Rook (1915), 93 Ohio St. 152; and Portage Markets Co. v. George (1924), 111 Ohio St. 775.
Although defendant competently points out the evidence and testimony supporting his claims, our review of the record reveals at least an equal quantity, as well as quality, of evidence supporting the claims of plaintiff. As noted, both parties claimed that the other had lied about their business relationship. During a trial which lasted two weeks, both sides presented abundant testimony and evidence to the jury. The record discloses that the jury had competent evidence before it on which to base its verdict. Briefly, plaintiff presented his testimony concerning the purchase; presented a signed and notarized stock certificate, a promissory note and cancelled checks; presented evidence that defendant had added plaintiff to defendant's business checking account; and presented an audiotape and translation. Standing alone, this is "some competent, credible evidence going to all the essential elements of the case." The trial court correctly concluded that the evidence presented was legally sufficient to warrant submission of the case to the jury.
Analogizing to the standard applied in criminal cases, a reversal of a judgment as being against the manifest weight of the evidence is an act reserved for only the most "exceptional case," where the evidence weighs heavily against the judgment. State v. Thompkins (1997),78 Ohio St.3d 380. In this, as in any other case, it was for the trier of fact to judge the credibility of the witnesses and evidence and to give appropriate weight to each. State v. DeHass (1967), 10 Ohio St.2d 230. Having carefully and closely reviewed the entire record, and having independently weighed the evidence and judged the credibility of the witnesses, we are unconvinced that the jury clearly lost its way.
The court correctly overruled defendant's motion for a directed verdict as that verdict was supported by sufficient evidence and does not stand against the manifest weight of the evidence. Sanek v. Duracoate Corp. (1989), 43 Ohio St.3d 169. Accord-ingly, defendant's first assignment of error is overruled.
In his second and third assignments of error, defendant argues that the trial court erred when it failed to exclude "other acts" evidence. Specifically, defendant maintains that the trial court improperly admitted evidence concerning his business dealings with two other Ethiopian immigrants, and that this evidence should have been kept from the jury pursuant to Evid.R. 404(B).
Evid.R. 404(B) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." However, such evidence may clearly be used to prove other things such as "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
It is well-established that the admission or exclusion of relevant evidence rests within the sound discretion of the trial court. State v. Robb (2000), 88 Ohio St.3d 59, 68, quoting State v. Sage (1987),31 Ohio St.3d 173, paragraph two of the syllabus. Absent an abuse of discretion, as well as a showing that the accused has suffered material prejudice, an appellate court will not disturb a ruling by a trial court as to the admissibility of evidence. State v. Martin (1985),19 Ohio St.3d 122, 129. An abuse of discretion connotes more than an error of law or judgment, and implies that the court's attitude is clearly and palpably unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
At trial, the court allowed testimony that Chakle Kumnegere and Tesfaye Asasyehgn, both Ethiopian immigrants, had each loaned defendant $20,000. In each case, defendant failed to repay the loan, claimed that it had never been made, claimed that the promissory notes had been manufactured, and that his signature thereon was forged.
While evidence of defendant's unrelated business dealings would have been inadmissible if its only purpose was to establish that defendant is a dishonest person, in this case the challenged testimony was relevant as it tended to show knowledge, a common plan, and an absence of mistake. First, in each instance, defendant obtained a loan from a native Ethiopian. In each case, defendant also claimed that the money was to be used in his successful business. In each case, defendant gave very little or no documentation in return for the loan, and the documentation which did exist was handwritten by Kumnegere and Tesfaye at defendant's insistence. Finally, in each instance, defendant denied the authenticity of the written documents, claiming them, as well as his signatures, to be forgeries.
In this case, we believe the trial court properly applied the balancing test called for in Evid.R. 403. Pursuant to Evid.R. 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. This is a heavy burden, as the mere existence of prejudice alone is not sufficient to justify the exclusion, and although defendant believes that the trial court should have reached a contrary conclusion, we are unable to conclude that the trial court abused its discretion. See Sage, supra. Accordingly, defendant's second and third assignments of error are overruled.
In his fourth assignment of error, defendant claims the trial court erred when it declined to instruct the jury on the affirmative defenses of settlement, accord and satisfaction, estoppel, failure of consideration, payment, and conditions precedent. We find no merit to any of these complaints.
We begin by recognizing that the trial court was not required to use defendant's proffered instructions. Rather, its obligation was to give correct instructions. State v. Guster (1981), 66 Ohio St.2d 266. We are also mindful that a determination as to which jury instructions are proper is a matter traditionally left to the discretion of the trial court. Id.
According to defendant, a reasonable jury could have concluded that plaintiff and defendant had settled their dispute. However, this assertion is plainly inconsistent with the position taken by defendant throughout trial and on appeal. Time and again, defendant claimed that there was no purchase or sale, as claimed by plaintiff, and that plaintiff fabricated not only this claim, but all of the evidence in support of the claim. Defendant did not present any evidence at trial which might support a finding that he and plaintiff reached an agreeable settlement of plaintiff's purchase of one-half of defendant's business. Without evidentiary support, an instruction on settlement would have clearly been improper.
Defendant next asserts that the jury could have concluded that plaintiff and defendant reached an accord and satisfaction. Accord and satisfaction is an affirmative defense to a claim for money damages. If a party against whom a claim for damages is made can prove accord and satisfaction, that party's debt is discharged by operation of law. In Allen v. R.G. Indus. Supply (1993), 66 Ohio St.3d 229, the Ohio Supreme Court explained:
 An accord is a contract between a debtor and a creditor in which the creditor's claim is settled in exchange for a sum of money other than that which is allegedly due. Satisfaction is the performance of that contract. * * * In Ohio, the situation in which an accord and satisfaction can arise is well settled:
 "Where there is a bona fide dispute over an unliquidated demand and the debtor tenders an amount less than the amount in dispute, upon the express condition that it shall be in full [satisfaction] of the disputed claim, the creditor has but one alternative; he must accept the amount tendered upon the terms of the condition, unless the condition be waived, or he must reject it entirely, or if he has received the amount by check in a letter, he must return it." * * *
 When an accord and satisfaction is pled by the defendant * * * the defendant must show that the parties went through a process of offer and acceptance — an accord. Second, the accord must have been carried out — a satisfaction. Third, if there was an accord and satisfaction, it must have been supported by consideration. * * * The first and second inquiries merge when the creditor manifests acceptance of the offer by negotiating a check sent by the debtor with the offer. "At common law, an accord and satisfaction is accomplished when a creditor accepts and deposits a check which the debtor offers as full payment for an unliquidated or disputed debt. * * * By cashing the check, the creditor manifests assent to the terms of a new contract which extinguishes the debtor's prior contractual obligation." * * * [Id. at 231-232.]
This affirmative defense is also clearly incompatible with the position taken by defendant at trial. As noted, defendant did not present any evidence which could have supported a conclusion that the parties negotiated a settlement, or accord and satisfaction, of plaintiff's claim that he purchased one-half of defendant's business. Interestingly, this claim would seem most appropriate if proffered by plaintiff in light of the checks, which were made out by plaintiff, deposited by defendant in his business account, and carried annotations that the checks were payment towards the purchase of an interest in defendant's business.
Defendant's claim that the jury could have concluded that plaintiff's claims were barred under the doctrine of equitable estoppel is also unwarranted. "Equitable estoppel prevents relief when one party induces another to believe certain facts exist and the other party changes his position in reasonable reliance on those facts to his detriment." State ex rel. Chavis v. Sycamore City School Dist. Bd. of Edn. (1994),71 Ohio St.3d 26, 34; and Chubb v. Ohio Bur. Of Workers' Comp. (1998),81 Ohio St.3d 275, 279, citing Chavis, supra, at 34.
In this case, it was incumbent upon defendant to demonstrate that plaintiff should be estopped from asserting his ownership claim. However, defendant put forth no evidence that he relied to his detriment upon any of plaintiff's statements. Indeed, defendant claimed that plaintiff's statements were lies.
Defendant also asserts that the jury should have been instructed on the affirmative defense of failure of consideration, because defendant believes that it could have theoretically concluded, despite defendant's steadfast claim that no purchase was made, that a purchase had occurred, but that plaintiff had only paid a portion of the agreed-upon price. However, defendant next argues that plaintiff's claim should have been barred by payment as defendant returned the purchase price for the Brothers Drive Thru, and no further business dealings occurred. Finally, defendant claims that the jury should have been instructed that plaintiff's claims were barred by the failure of a condition precedent. Again, defendant now argues that a jury could have believed that defendant agreed to sell one-half of his business to plaintiff, but that plaintiff only paid defendant one-half of the purchase price, or $68,041. Again, these affirmative defenses were entirely inconsistent with defendant's position and the evidence introduced at trial. Therefore, defendant's fourth assignment of error is overruled.
In his fifth assignment of error, defendant claims that it was error for the trial court to admit the tape and translation of the November 8, 1998 recorded conversation between plaintiff and defendant. Defendant first asserts that the trial court admitted the recording in violation of Evid.R. 1002, which provides:
 To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio.
However, our review reveals defendant presented no evidence that the recording introduced into evidence was not in fact the original recording of the conversation made by plaintiff on November 8, 1998. Furthermore, Evid.R. 1003 provides:
 A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original.
As noted, defendant fails to present any argument concerning the authenticity of the recording. Accordingly, there is no merit to defendant's first argument.
Defendant next claims that "[a]dmission of a transcript when the original recording is available violates the best evidence rule and is reversible error." (Defendant-appellant's brief at 34.) Defendant's argument ignores the fact that almost the entire recorded conversation was spoken in Ahmaric, the parties' native tongue. It is undisputed that no member of the jury understood Ahmeric; therefore, a translation and transcript was essential. Defendant's fifth assignment of error is overruled.
In his sixth assignment of error, defendant argues that the recording and transcript should not have been admitted because portions of the recording were inaudible, and because the translation was not trustworthy. In this case, the trial court conducted in an in camera review, listened to the recording, and determined that, as a whole, it was indeed audible. Defendant presents no convincing reason why we should rule otherwise.
Defendant also argues that plaintiff's translator inaccurately translated portions of the recording. At trial, defendant was permitted to challenge plaintiff's witness regarding his ability and qualifications. Defendant was permitted to explain to the jury that certain portions of the tape were inaudible. If defendant had chosen to do so, he could certainly have presented testimony from an expert of his own that the translation of plaintiff's witness was inaccurate. However, defendant chose not to present any evidence when he had the opportunity to do so.
The testimony presented by plaintiff's witness, his qualifications as an expert, and his translation of the recording, are matters which are entrusted to the discretion of the trial court. State v. Coleman (1999), 85 Ohio St.3d 129. Evid.R. 702 provides that a witness may testify as an expert if he or she possesses specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony. Prior to the testimony of plaintiff's witness, the court took evidence that he was a native Ethiopian, that he took coursework in English in both high school and college in Ethiopia, and that all subjects from grades seven through college in Ethiopia are taught in English. He also testified that he worked for Community Refugee and Immigration Services, and that that organization is certified to provide interpretation services to the Franklin County Court of Common Pleas. Defendant's claims that the trial court erred in qualifying plaintiff's witness as an expert, and that the translation presented by plaintiff is inaccurate, are not supported by the evidence. Accordingly, defendant's sixth assignment of error is overruled.
In his seventh assignment of error, defendant complains that the trial court erred when it admitted into evidence that many Ethiopians habitually, or routinely, do business, even in significant amounts, with little or written documentation.
The admission or exclusion of relevant evidence rests within the sound discretion of the trial court, as does the court's ruling upon evidentiary objections. State v. Robb (2000), 88 Ohio St.3d 59, 68, quoting Sage, supra, paragraph two of the syllabus. Absent an abuse of discretion, as well as a showing that the accused has suffered material prejudice, an appellate court will not disturb a ruling by a trial court as to the admissibility of evidence. Martin, supra, at 129. An abuse of discretion connotes more than an error of law or judgment and implies that the court's attitude is clearly and palpably unreasonable, arbitrary or unconscionable. Blakemore, supra, at 219.
All of the witnesses called by the parties in this case were native Ethiopians. As noted, the essence of plaintiff's claim was that he transferred what amounted to his entire life savings to defendant in a series of transactions, but had very little written documentation to support this claim. It was important for plaintiff to explain this lack of documentation, which is normally expected when Americans do business. We find no abuse of discretion on the part of the trial court in allowing this evidence. Therefore, defendant's seventh assignment of error is also overruled.
In his eighth assignment of error, defendant complains that plaintiff failed to file a copy of defendant's deposition, taken in unrelated litigation, at least one day prior to trial. While defendant correctly recognizes that the requirement of filing is designed to prevent an ambush of the party against whom the deposition is to be used (see Evans v. Smith [1991], 75 Ohio App.3d 160), defendant offers absolutely no evidence that he suffered any actual prejudice in this case. Moreover, prior to trial, the court explained that it usually did not require actual filing with the clerk, merely notice to the opposing party.
While plaintiff should have filed a copy of defendant's deposition in compliance with Civ.R. 32, we find that his failure to do so amounted to harmless error. Admittedly, he was questioned regarding his own deposition. Because we find plaintiff's failure to file in accordance with Civ.R. 32 to be harmless error, we hereby overrule defendant's eighth assignment of error.
In his ninth assignment of error, defendant complains that the trial court erred when it awarded plaintiff certain costs. Specifically, defendant claims that the trial court improperly allowed plaintiff costs for copying in the amounts of $21.60, $30.46, and $129.85. He also contests costs awarded for paralegal fees in the amount of $1,437.50, court reporter fees in the amount of $687.48, and the cost of two deposition transcripts in the amounts of $681.40 and $119.20.
In Williamson v. Ameritech Corp. (1998), 81 Ohio St.3d 342, the Ohio Supreme Court explained that:
 Civ.R. 54(D) provides the general rule allowing costs to the prevailing party in a civil case unless the court otherwise directs. The categories of litigation expenses comprising "costs" are, however, limited. * * * "Costs are generally defined as the statutory fees to which officers, witnesses, jurors and others are entitled for their services in an action and which the statutes authorize to be taxed and included in the judgment." * * * "The subject of costs is one entirely of statutory allowance and control." * * * [Id. at 343.]
In Haller v. Borror (1995), 107 Ohio App.3d 432, we held that a trial court may tax as costs the fees of a court reporter, as well as the costs of transcripts of depositions. Accordingly, the court reporter fees in the amount of $687.48, and the cost of two deposition transcripts in the amounts of $681.40 and $119.20 were properly charged as costs. See, also, Miller v. Gustus (1993), 90 Ohio App.3d 622. However, in Haller, we recognized that copying expenses are not properly charged as costs. Thus, the trial court improperly allowed plaintiff costs for copying in the amounts of $21.60, $30.46, and $129.85. We are also unaware of any support for the court's imposition of plaintiff's paralegal fees in the amount of $1,437.50.
In summary, we find that the trial court properly awarded costs in the total amount of $1,488.08. However, we conclude that it erred in awarding costs in the amount of $1,619.41. Defendant's ninth assignment of error is therefore sustained in part and overruled in part.
In his tenth assignment of error, defendant argues that the trial court incorrectly instructed the jury on the standard of proof for plaintiff's claim for fraud. While it appears that both parties agreed to the jury instructions prior to the giving of those instructions by the trial court, it is also undisputed that defendant did not object to the court's instruction regarding the standard of proof for establishing fraud. Civ.R. 51 provides, as follows:
 At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. Copies shall be furnished to all other parties at the time of making the requests. The court shall inform counsel of its proposed action on the requests prior to counsel's arguments to the jury and shall give the jury complete instructions after the arguments are completed. The court also may give some or all of its instructions to the jury prior to counsel's arguments. The court need not reduce its instructions to writing.
 On appeal, a party may not assign as error the giving or the failure to give any instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury.
Because defendant failed to object to the instructions given to the jury, we must evaluate his claim under the "plain error" standard. Plain error is found where, but for the error, the outcome of the trial would have been clearly different had the alleged error not occurred. State v. Franklin (1991), 62 Ohio St.3d 118, certiorari denied (1992),504 U.S. 960. See, also, State v. Waddell (1996), 75 Ohio St.3d 163,166. In other words, "the mere possibility that the jury might have reached a different conclusion is not sufficient to sustain the plain error standard." State v. Carr (Aug. 23, 2001), Franklin App. No. 00AP-1235, unreported. See, also, State v. Golden (Dec. 20, 2001), Franklin App. No. 01AP-367, unreported. The doctrine is to be applied with the utmost caution and only in order to prevent a miscarriage of justice. State v. Long (1978), 53 Ohio St.2d 91.
In this case, defendant offers nothing more than mere speculation that the jury would have rendered a verdict in his favor absent the trial court's incorrect instruction. Again, "mere possibility" is not enough; defendant must come forward with convincing evidence, which he has completely failed to do. In reaching this conclusion, we note that the Ohio Supreme Court has even precluded a defendant insurer from arguing on appeal that the trial court erred in instructing the jury that the judgment against the insured in a prior action was binding on the jury in a subsequent action against the insurer, as the insurer's reason for objecting to the jury instruction at trial was not the same objection it presented on appeal. See Leber v. Smith (1994), 70 Ohio St.3d 548. Accordingly, defendant's tenth assignment of error is overruled.
In his eleventh assignment of error, defendant argues that the trial court improperly instructed the jury to allow plaintiff to rescind the parties' contract plus damages for lost profits. While we generally agree with defendant's characterization of the law regarding rescission as a result of fraudulent inducement and damages based upon lost profits arising from the rescinded contract, in this case, the jury did not award damages based on lost profits. As noted by plaintiff, the jury awarded compensatory damages which were comprised of plaintiff's initial investment of $185,041, a promissory note in the amount of $27,406.61, and interest paid on cash advances in the amount of $3,000. The total of these amounts equals the jury's damage award, leaving no question the jury did not award damages based upon lost profits. Therefore, even assuming error, it was harmless. Defendant's eleventh assignment of error is overruled.
In his twelfth assignment of error, defendant argues that the trial court erred when it failed to grant his motion for directed verdict and/or his motion for judgment notwithstanding the verdict on plaintiff's claim for punitive damages. As this court explained in Barker v. Netcare Corp. (Dec. 11, 2001), Franklin App. No. 01AP-230, unreported, Civ.R. 50(A)(4) governs the standard for directed verdicts and provides that:
 "When a motion for directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."
 In ruling on a motion for a directed verdict, a trial court is required to construe the evidence most strongly in favor of the nonmovant. Civ.R. 50(A)(4); Strother v. Hutchinson (1981), 67 Ohio St.2d 282, 284. The motion must be denied where there is substantial evidence to support the nonmoving party's case and reasonable minds may reach different conclusions. Posin v. A.B.C. Motor Court Hotel (1976), 45 Ohio St.2d 271, 275. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon the motion. Id. A motion for directed verdict tests whether the evidence presented is legally sufficient to take the case to the jury. Wagner v. Midwestern Indemn. Co. (1998), 83 Ohio St.3d 287, 294. [Id.]
Similarly, in Posin v. A.B.C. Motor Court Hotel, Inc. (1976),45 Ohio St.2d 271, the Ohio Supreme Court set forth the standard for a judgment notwithstanding the verdict:
 The test to be applied by a trial court in ruling on a motion for judgment notwithstanding the verdict is the same test to be applied on a motion for a directed verdict. The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions. [Id. at 275.]
Having carefully reviewed the entire record of these proceedings, paying particular attention to the evidence and testimony adduced at trial, we are unable to conclude either that the evidence presented was insufficient to support an award of punitive damages, or that the jury's award is against the manifest weight of the evidence. Defendant's argument fails because there was evidence and testimony presented that defendant's fraud was complicated and premeditated. There was also evidence presented that defendant threatened to kill, or do serious bodily harm to plaintiff and that, on one occasion, plaintiff found two individuals with guns parked next to his car. Having construed the facts established in the record most strongly in favor of plaintiff, we find that reasonable minds could easily reach different conclusions. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions. We conclude that the jury acted within its province when it concluded that an award of punitive damages was appropriate under the circumstances. Defendant's twelfth assignment of error is overruled.
In his thirteenth assignment of error, defendant raises several complaints. According to defendant, the trial court conducted itself in an unfair and partial manner when it referred, on one occasion, to defense witness Chakle Kumnegere as "Mr. Whatever-your-name is." (Tr. 1189.) While we agree that this comment was less than professional, it does not show partiality, nor, in our opinion, that the trial court acted unfairly. Defendant also complains that the trial court erred when it "refused" to appoint an interpreter for Mr. Kumnegere. This claim is not well-taken for three reasons. First, Mr. Kumnegere was in fact called as a defense witness. Second, he did not at any time during his direct examination state that he had a problem understanding the questions asked of him or that he needed an interpreter. Third, defendant failed to provide an interpreter for his witness or ask the trial court to appoint one. He therefore failed to preserve this issue for appellate review. Finally, defendant contends that plaintiff's counsel was permitted to testify as a witness in this case in violation of DR 5-101 and 5-102. However, the "testimony" to which defendant refers was actually the questioning of Mr. Kumnegere by plaintiff's counsel. Accordingly, defendant's thirteenth assignment of error is overruled.
In his fourteenth assignment of error, defendant argues that the trial court abused its discretion when it awarded plaintiff attorney fees. In Galmish v. Cicchini (2000), 90 Ohio St.3d 22, the Ohio Supreme Court explained:
 * * * [Defendant] asserts that "[t]he trial court erroneously awarded attorney fees when (a) the plaintiff had no legal basis to recover fees, and (b) the trial court received inadequate evidence to support its finding that the claimed fees are reasonable."
 In support, [defendant] argues that the appropriateness of awarding attorney fees in this case is dependent upon the propriety of the award for punitive damages. Accordingly, "[i]f this Court reverses the punitive damage award, it should likewise reverse the attorney fee award." We agree, but the corollary is also true. "If punitive damages are proper, the aggrieved party may also recover reasonable attorney fees." Columbus Finance, Inc. v. Howard (1975), 42 Ohio St.2d 178, 183. * * * In other words, "[a]ttorney fees may be awarded as an element of compensatory damages where the jury finds that punitive damages are warranted." Zoppo v. Homestead Ins. Co. (1994), 71 Ohio St.3d 552, 558. * * * Since we have found no error with regard to the award for punitive damages, [plaintiff] may also recover reasonable attorney fees. [Id. at 35.]
In this case, defendant makes precisely the same argument. Pursuant to Galmish, and our disposition of the twelfth assignment of error, defendant's fourteenth assignment is also overruled.
In his fifteenth and final assignment of error, defendant argues that the trial court abused its discretion when it refused to grant him a new trial on the basis of cumulative error.
In Mannion v. Sandel (2001), 91 Ohio St.3d 318, the Ohio Supreme Court examined the requirements for granting a new trial. The court was guided by the first paragraph of the syllabus of Rohde v. Farmer (1970),23 Ohio St.2d 82, which provides:
 Where a trial court is authorized to grant a new trial for a reason which requires the exercise of a sound discretion, the order granting a new trial may be reversed only upon a showing of abuse of discretion by the trial court.
Thus, we review a trial court's decision under the abuse of discretion standard. An abuse of discretion implies that a court's ruling is unreasonable, arbitrary, or unconscionable; it is undoubtedly more than an error in judgment. State ex rel. Richard v. Seidner (1996),76 Ohio St.3d 149. When applying the abuse of discretion standard, the reviewing court must "view the evidence favorably to the trial court's action rather than to the original jury's verdict." Malone v. Courtyard by Marriott L.P. (1996), 74 Ohio St.3d 440, 448, quoting Rohde, supra, at 94.
Viewing the evidence favorably to the trial court's decision, and having reviewed the trial transcript, we find that the trial court correctly concluded that the jury's verdict was supported by competent, credible evidence. Moreover, we have overruled each of defendant's assignments of error (save for a recalculation of appropriate expenses) and find that none of the trial court's reasons for denying defendant's motion for a new trial to be arbitrary, capricious, or unreasonable. Defendant's fifteenth assignment of error is, therefore, overruled.
In his cross-appeal, plaintiff argues that the trial court improperly refused to award plaintiff prejudgment interest, pursuant to R.C. 1343.03. In its December 22, 2000 Decision and Journal Entry, the trial court denied plaintiff's request for prejudgment interest pursuant to R.C.1343.03(C), which provides, as follows:
 Interest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortious conduct and not settled by agreement of the parties, shall be computed from the date the cause of action accrued to the date on which the money is paid if, upon motion of any party to the action, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case.
The trial court stated in its entry:
 Plaintiff next seeks prejudgment interest pursuant to a motion and memorandum, with no accompanying evidentiary material. At the December 4th hearing, Plaintiff argued orally his request for prejudgment interest, but submitted no evidentiary material supporting the lack of good faith by Defendant in attempting to settle the case. A prejudgment interest hearing must be evidentiary. It may be non-oral, but must still be evidentiary in nature. A trial court may not grant prejudgment interest absent sufficient evidence to show that the opposing party failed to make as [sic] good faith effort to settle the case. * * * [Id. at 3.]
The determination of whether prejudgment interest is appropriate under R.C. 1343.03(C) is clearly tied to whether or not defendant and plaintiff failed to make a good faith effort to settle the case. The only evidence offered in support of plaintiff's claim to interest pursuant to R.C.1343.03(C) was the testimony of plaintiff's counsel. We have reviewed that testimony, wherein counsel in effect explained to the court that pretrial settlement was not entertained because the parties "were at polar opposites." (Tr. 1797.) As noted by plaintiff's counsel, each party accused the other of fraud, and further, defendant was in bankruptcy proceedings prior to trial. Considering the evidence placed before the court, we do not believe that the trial court acted unconscionably when it denied plaintiff's request for prejudgment interest pursuant to R.C.1343.03(C).
Plaintiff also sought an award of prejudgment interest pursuant to R.C. 1343.03(A); however, this section was not specifically addressed by the court in its decision and entry. It provides, as follows:
 In cases other than those provided for in sections 1343.01 and 1343.02 of the Revised Code, when money becomes due and payable upon any bond, bill, note, or other instrument of writing, upon any book account, upon any settlement between parties, upon all verbal contracts entered into, and upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or a contract or other transaction, the creditor is entitled to interest at the rate of ten per cent per annum, and no more, unless a written contract provides a different rate of interest in relation to the money that becomes due and payable, in which case the creditor is entitled to interest at the rate provided in that contract.
R.C. 1343.03(A) facially applies to situations wherein a debtor owes a creditor money. In this case, however, plaintiff did not become a creditor, a judgment creditor, until the jury returned a verdict in his favor. Thus, he is not entitled to prejudgment interest from the date of purchase. Plaintiff's cross-assignment of error is therefore overruled.
For the foregoing reasons, defendant's ninth assignment of error is sustained in part and overruled in part, and defendant's remaining fourteen assignments of error, as well as the cross-assignment of error raised by plaintiff, are overruled. The judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part, and this cause is remanded to that court with instructions to recalculate the costs awarded to plaintiff, reducing the amount awarded by $1,619.41 for a total award of $1,488.08.
Judgment affirmed in part, reversed in part, and cause remanded with instructions.
BOWMAN and McCORMAC, JJ., concur.
McCORMAC, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.